Scheffler Karlinsky & Stein, New York City (Robert P. Stein, Martin E. Karlinsky, Lori A. Friedman, of counsel), for plaintiff.

Squadron, Ellenoff, Plesent & Lehrer, New York City and Rosenberg & Estis, P.C., New York City (Elliot G. Sagor, Neal M. Goldman, Dori Ann Hanswirth, of counsel), for defendant.

**ASSOCIATED DRY GOODS CORPORATION, Plaintiff,**

v.

**TOWERS FINANCIAL CORPORATION, Defendant.**

**No. 88 Civ. 9178 (RWS).**

United States District Court, S.D. New York.

July 10, 1989.

OPINION

SWEET, District Judge.

Defendant Towers Financial Corporation ("Towers" or the "Subtenant") has moved under Rules 12(b)(7) and 19 of the Federal Rules of Civil Procedure to dismiss the complaint of plaintiff Associated Dry Goods Corporation ("ADG" or the "Tenant") for failure to join 417 Fifth Avenue Realty Company ("417 Fifth" or the "Landlord") as an indispensable party. ADG has cross-moved for summary judgment under Rule 56, Fed.R.Civ.P. For the reasons set forth below, the motion of Towers is granted, that of ADG denied, and the complaint will be dismissed.

*The Parties*

ADG is a Virginia corporation with its principal office in St. Louis, Missouri. It is a subsidiary of the May Department Stores Company ("May") and has leased space from 417 Fifth at that address.

May is a publicly held company with its principal place of business located in St. Louis, Missouri. It is one of the largest retailers and department store operators in

the United States. Among other stores, it owns and operates Lord & Taylor, Caldor, Hahne's, and Sibley's. In its last full operating year, May had sales in excess of $12 billion. 417 Fifth Avenue was ADG's corporate headquarters for many years prior to ADG's acquisition by May.

Towers is a publicly held Nevada corporation with its principal place of business in New York City. It has subleased space at 417 Fifth from ADG. It provides financial services including equipment lease financing, accounts receivable managing and factoring, short-term financing for leveraged buyouts, financial guarantees and letters of commitment. It has more than 4,000 clients and employs more than 500 people.

### Prior Proceedings

On July 5, 1988 by order to show cause brought in the Supreme Court of the State of New York, Towers sought to compel 417 Fifth, the Landlord, to consent to certain electrical work which Towers sought to have performed. That action, under circumstances to be described below, was discontinued in September 1988.

This action was commenced by ADG on December 28, 1988 against Towers seeking payment of rent alleged to be due on the sublease. On February 10, 1989 Towers filed the instant motion to dismiss for lack of an indispensable party, 417 Fifth, the Landlord. ADG cross-moved for summary judgment to obtain the rent alleged to be owing on the sublease.

On March 27, 1989 Towers commenced an action in the Supreme Court of the State of New York against 417 Fifth Avenue and ADG alleging fraud, and effected service on ADG on April 14, 1989 (the "State Court Action").

The parties adjourned the hearing date of the instant motions until April 21, 1989 at which time they were fully submitted. Correspondence indicates that the parties have continued since that date to follow the suggestion made at oral argument that this $10 million dollar dispute be resolved by prudent businessmen rather than through the efforts of the highly skilled lawyers here present.

### The Facts

The facts are established by affidavit and in the main are not in dispute except as noted below.

Since June 1987, Towers' principal place of business has been at the building located at 417 Fifth Avenue, New York (the "building"). At that time it subleased the ninth floor from ADG. Towers' business is heavily dependent on fast, efficient handling of information relating to hundreds of thousands of individual transactions. In order to achieve its position in its field, it has developed state-of-the-art computer capability. Its ability to grow and its continued well-being require continual modernization and expansion of that computer capability.

Shortly after Towers moved into the building, it sought more space from ADG which had space on the seventh and eighth floor following the takeover by May. Steven Hoffenberg, Chairman, President, and Chief Executive Officer of Towers ("Hoffenberg") met with Arthur Lerner, a Vice-President of Helmsley–Spear, ADG's agent ("Lerner"), and discussed the electricity Towers required. Lerner told Hoffenberg that the space was suited for Towers' needs and took him on a tour of the seventh and eighth floors, pointing out the numerous electrical outlets and conduits, and representing that there was more than enough electricity to meet their needs.

On January 19, 1988 ADG, as Tenant, and Towers, as Subtenant, executed the Sublease for 18,204 square feet of space on the eighth floor and the entire seventh floor of 417 Fifth Avenue. Pursuant to Paragraph 2.3 of the Rider to the Sublease, Towers' obligation to pay rent was to commence "six (6) months from the date [Towers] is first given possession of the eighth floor and eight (8) months from the date [Towers] is first given possession of the seventh floor space." Towers obtained such possession on February 22, 1988, and its rental obligations thus commenced six and eight months, respectively, from that date, or on August 22, 1988, with respect to the eighth floor, and October 22, 1988, with

respect to the seventh floor. No rental has been paid as a result of the difficulties described below.

Paragraph 6 of the Consent to Sublease executed by the Landlord provides as follows:

> Subtenant acknowledges and agrees that Subtenant is accepting the subject premises in their "as is" condition and that neither Landlord nor Tenant make any representations or warranties of any nature as to the subject premises or their fitness for any particular purpose.

Paragraph 3 of the Sublease pertaining to the "use of premises" states that the premises may be used "for executive, accounting and other general office functions in connection with undertenant's business." Paragraph 41B of the main lease between ADG and 417 Fifth states:

> Tenant's use of electric current in the demised premises shall not at any time exceed the capacity of any of the electrical conductors and equipment in or otherwise serving the demised premises in order to insure that such capacity is not exceeded and to avert possible adverse effects upon the building electric service. Tenant shall not without Landlord's prior written consent in each instance, connect any additional fixtures, appliances or equipment (other than lamps, typewriters and similar small office machines) to the building electric distribution system or make any alteration or addition to the electric system of the demised premises existing at the commencement of the term of this Lease, and Landlord, his agent or consultant, is given the right to make surveys from time to time in the demised premises covering the electrical equipment and fixtures, and use of current.... Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric current furnished to the demised premises other than such as may result from Landlord's negligent or otherwise wrongful act or omission.

Paragraph 10.3 of the Sublease provides that the Sublease "constitutes the entire understanding between the parties," and that "all prior understandings, agreements, representations, warranties and undertakings are expressly merged into this sublease."

Paragraph 1.1 to the Sublease rider, provides as follows:

> Overtenant recognizes that undertenant will be required to expend substantial sums for both the premises demised hereunder and the premises previously demised to undertenant by overtenant in consequence of its entering into this sublease. Accordingly, overtenant agrees to reimburse undertenant for all sums expended by undertenant for this purpose, including, but not limited to, construction or removal of wall partitions, ceilings, computer, telephone and electrical wiring, security systems, telephone company system equipment, wall covering, floor covering, kitchen appliances, workstations, HVAC equipment.

Paragraph 24 of the Sublease Consent states:

> In connection with any alteration subtenant shall prior to commencing all work, shall [sic] submit all plans and/or specifications to Landlord for Landlord's approval, which approval shall not be unreasonably withheld or unduly delayed.* The Landlord's approval shall not be required for decorative or aesthetic type changes.

---

* which all mean not more than 30 days from subtenant's request.

Towers received an executed copy of the Sublease Consent and the keys to the premises on or about March 14, 1988. Towers discovered that the existing electrical service on the seventh and eighth floors was not as had been represented by Lerner and that the outlets and conduits were not connected to any power. Towers and ADG reached a supplemental letter agreement dated April 28, 1988 which allowed Towers to use 150 amps of power from space on the sixth floor.

In May, 1988 the Landlord, 417 Fifth, advised Towers that before it would approve the ADG/Towers letter agreement, it would require a schematic plan reflecting

the proposed electrical modifications. In order to comply with the Landlord's demand for such plan, Towers needed access to the building's basement, where the electrical apparatus is located, so that its engineer could prepare the drawings which the Landlord required. However, access was denied.

By letter dated June 17, 1988, Towers was advised by its electrical contractor that in addition to the 150 amps of electrical service which ADG agreed to provide, Towers apparently needed an additional 200 amps of electric power to accommodate a 7½ ton air conditioner in its computer room on the eighth floor, as well as various computer terminals. By letter dated July 5, 1988, Towers asked ADG to "request that the landlord grant [Towers] the right to use an additional 200 amps of electrical service from the electrical power currently unused in the building...."

On July 5, 1988 Towers commenced its first state court action to compel the Landlord to grant access and consent to alterations. In September 1988 ADG and the Landlord requested discontinuance of the state lawsuit as a condition to their engaging in further settlement negotiations. On September 6, 1988 Melanie Mann, Director of Real Estate Productivity of May and ADG ("Mann") sent Hoffenberg a letter stating that if the Landlord has not responded reasonably to the plans submitted by Towers within 45 days of the date of submission, "then Associated [ADG] will support Towers in the pursuit of Towers' rights under the sublease documents ..." subject to Towers not causing "a material default with regard to its obligations under the sublease documents."

On November 30, 1988, Towers advised ADG that it now needed an additional 250 amps of electrical power, and asked whether ADG could accommodate this need from any excess electrical capacity available to ADG. ADG prepared an agreement similar in form to the April 28, 1988 letter agreement with respect to the additional 250 amps and met with Hoffenberg and Michael Rosoff, President and Vice-President of Towers ("Rosoff").

Between November 30 and December 14, 1988, several drafts of a formal agreement respecting payment for and the providing of the additional 250 amps of electric power requested by Towers were exchanged between the parties. No agreement was reached. At some time during this period, according to Towers, ADG diverted electrical capacity to the May affiliate, Lord & Taylor, across the street.

In addition to the space leased to Towers under the Sublease, ADG also subleased to Towers the entire ninth floor of 417 Fifth Avenue, pursuant to a separate sublease. Towers is also in default with respect to its rental obligations under that sublease, having failed to pay additional rent and other charges aggregating $255,551.83, as of March 1, 1989, according to ADG.

Towers has not been able to use the subleased space as it had intended. ADG has not received its rental for the Sublease for over 48,000 square feet under the sublease which has an estimated value of over $10 million over its term. The dispute between the parties continues to escalate beyond the bounds of the usual landlord/tenant dispute.

*Dismissal for the Failure to Join the Landlord as an Indispensable Party*

Rule 19 sets forth a "two step inquiry for determining when it is proper to dismiss an action for inability to obtain jurisdiction over an individual with an interest in the litigation." *Hansen v. Peoples Bank of Bloomington,* 594 F.2d 1149, 1150 (7th Cir.1979). *See also, Burger King Corporation v. American National Bank and Trust Company of Chicago,* 119 F.R.D. 672, 674 (N.D.Ill.1988); *Ronson Corporation v. First Stamford Corporation,* 48 F.R.D. 374, 376 (D.Conn.1970). Rule 19(a) sets forth the requirements for joinder of parties, where feasible. Rule 19(b) concerns cases in which the person cannot be joined.

■ Rule 19(a) Fed.R.Civ.P., provides in pertinent part:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive

the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

As to whether the Landlord is an indispensable party under 19(a)(1), Towers has asserted that its answer to the ADG complaint would include counterclaims against ADG for breach of Section 5.1 of the sublease agreement, which provides that:

> overtenant covenants and agrees that undertenant will peaceably and quietly enjoy the premises hereby demised, and overtenant will not act, or fail to do any act, which would destroy, in whole or in part, overtenant's covenant.

Towers has also asserted that it would include a second counterclaim against ADG for breach of the representations made by the September 6, 1988 letter. In addition, Towers' putative answer would bring third-party claims against the Landlord for breach of its duty to act in good faith, for interference with Towers' business and for breach of paragraph 14 of the consent to sublease. That paragraph provides as follows:

> In connection with any alteration subtenant shall prior to commencing all work, shall [sic] submit all plans and/or specifications to Landlord for Landlord's approval, which approval shall not be unreasonably withheld or which approval shall not be unreasonably withheld or unduly delayed [,] which shall mean not more than 30 days from subtenant's request. The Landlord's approval shall not be required for decorative or aesthetic type changes.

According to Towers' proposed answer and counterclaims, unless the Landlord is compelled to change its course and to act on the plans submitted, Towers will never be able to enjoy quietly the premises it had leased from ADG.

The general rule is that "where rights sued upon arise from a contract, all parties to it must be joined." *Ward v. Deavers*, 203 F.2d 72, 75 (D.C.Cir.1953); *accord Harris Trust and Savings Bank v. Energy Assets Intern'l Corp.*, 124 F.R.D. 115 (E.D. La.1989). Here the Landlord is a signatory to two of the three sublease documents— the overlease and the consent to sublease.

Towers has asserted that the Landlord and the Subtenant have failed to provide a standard amount of electricity under the sublease, that the Landlord has unreasonably withheld its consent to changes in the wiring necessary to provide adequate electricity and that ADG has breached its obligations under the September 28 letter by failing to obtain the Landlord's reasonable consent. The history of the dispute as recounted above, the pendency of the state court action, and the logic of the situation define the Landlord as an indispensable party under Rule 19(a)(1).

Towers also seeks to establish indispensability under 19(a)(2). It is possible to discern a risk to Towers of "double, multiple or otherwise inconsistent obligations." Resolution of the issues with ADG concerning its alleged duty and the reasonableness of the Landlord's consent could well present inconsistent results with respect to Towers' obligations if raised in separate proceedings. Therefore, the Landlord falls within the bounds of Rule 19(a)(2).

█ Once the applicability of Rule 19(a) has been determined, the question of dismissal under Rule 19(b) is presented. Fed. R.Civ.P. 19(b) reads in pertinent part as follows:

> **(b) Determination by Court Whenever Joinder Not Feasible.** If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed

among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

As discussed by the United States Supreme Court in *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968), Rule 19(b) lists four interests that must be examined to determine whether the court should proceed without a party who should be joined. The first is whether the plaintiff has a forum where its claims may be adjudicated. 390 U.S. at 109, 88 S.Ct. at 737. Here, two out of the three proposed parties have their principal places of business within the State of New York. The other party, ADG, certainly maintains sufficient contact with, and does enough business in, the State of New York to satisfy the minimum contacts requirements for the assertion of New York's long-arm statute. *See, e.g.*, N.Y.Civ.Prac.Law and Rules 302(a)(4) (use of real property within state sufficient to confer personal jurisdiction if cause of action arises out of such use); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55 (2d Cir.1985). In addition, a dispute involving real estate is particularly suitable to adjudication by the state wherein that real property is situated regardless of other contacts. *See Broussard v. Columbia Gulf Transmission Company*, 398 F.2d 885, 889 (5th Cir.1968); *Ronson Corporation v. First Stamford Corporation*, 48 F.R.D. at 378. Thus, ADG has an alternative forum.

The second factor listed by the Supreme Court in *Provident Tradesmens* is the interest of the defendant in avoiding multiple litigation or inconsistent relief. 390 U.S. at 110, 88 S.Ct. at 738. Here, litigation between Towers, the Landlord, and ADG has already arisen in state court out of the same facts and circumstances.

The third factor to be weighed pursuant to Rule 19(b) is the interest of the absent party whom it would have been desirable to join. As the Supreme Court pointed out in *Provident Tradesmens*, any judgment rendered in a case is not enforceable against a nonparty. 390 U.S. at 109, 88 S.Ct. at 737. Accordingly, as stated above, the Landlord,

who as a practical matter must be involved if the parties are to come to some resolution of this dispute, will not be affected by any judgment rendered in this case unless a party.

The final factor to be evaluated under Rule 19(b) analysis is the interest of the courts and the public in the complete, consistent and efficient settlement of controversies. *Provident Tradesmens*, 390 U.S. at 111, 88 S.Ct. at 738. To allow this case to go forward without the Landlord as a party would create inefficiency, lack of completeness and possible inconsistency. In light of this inefficiency and the pending State Court action, the action should be dismissed pursuant to Rule 19(b).

To resist this result, ADG, in addition to maintaining that 417 Fifth is not an indispensable party, proposes first that the Landlord be aligned with Towers, thus preserving diversity and second, that the Towers' dispute with the Landlord be encompassed within the court's ancillary jurisdiction, citing *ABCKO Music, Inc. v. Beverly Glen Music, Inc.*, 554 F.Supp. 410, 412 (S.D.N.Y.1983).

As to alignment, it is difficult given the facts and claims described above to align Towers with 417 Fifth, since the gravamen of the Towers' cause of action against ADG and its claim against 417 is the failure of the former to assist in persuading the latter to perform its alleged duty under the Consent to Sublease.

As to the claim of ancillary jurisdiction, the commentators have pointed out that under these circumstances it proves too much.

> Thus the *Gibbs* doctrine has been recognized as an interpretation of the jurisdictional statutes rather than a license to exceed the statutory jurisdiction, and it seems to follow that in cases in which there is subject matter jurisdiction under the pendent party doctrine, Rule 19 applies and the court should order joinder of parties meeting the criteria of subdivision (a)(1)–(2) in cases in which they have been omitted.
>
> Actions in which jurisdiction is based on diversity of citizenship proceed on dif-

ferent footing. In such cases, unlike those brought pursuant to a federal claim, the compulsory joinder of non-diverse parties under Rule 19(a) will deprive the court of subject matter jurisdiction. Under the doctrine of complete diversity, therefore, the court cannot order joinder but must proceed under Rule 19(b) to determine whether in equity and good conscience it can retain the action between parties present.

3A J. Moore, J. Lucas, *Moore's Federal Practice,* § 19.04 (2d ed. 1984).

ADG relies upon *ABCKO Music, Inc.,* 554 F.Supp. at 412, to support its ancillary jurisdiction position. However, there it was the alleged copyright infringement which provided federal jurisdiction, while here it is diversity, which would be destroyed given the proper alignment of the parties.

*Summary Judgment*

Given the conclusion that this action should be dismissed under Rule 19, it would be inappropriate to reach the summary judgment issues.

*Conclusion*

The history of this dispute leads to the conclusion that ADG has understandably sought to invoke federal jurisdiction in an effort to obtain discrete and immediate relief. For the reasons set forth above, the effort has failed for want of an indispensable party, the Landlord. Perhaps such a result would have been obviated had ADG in fact aligned 417 Fifth with Towers as a defendant, but under the present circumstances, the complaint is dismissed.

Settle judgment on notice.

It is so ordered.